J-S37007-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAMAR OGELSBY | : | |
| | : | |
| Appellant | : | No. 248 EDA 2020 |

Appeal from the PCRA Order Entered November 14, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005339-2012

BEFORE: SHOGAN, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.: Filed: December 30, 2020

Appellant, Lamar Ogelsby, appeals from the order denying his petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546. We affirm.

A prior panel of this Court summarized the facts of this case, as follows:

On December 24, 2006, at approximately 3:00 a.m., Officer Tyrone Harding of the Police Department of the University of Pennsylvania was patrolling his district when he heard gunshots, and then a woman screaming. He drove toward the sounds and found the woman on the 3900 block of Market Street. The woman, Tamia Hill, was standing next to a prone and unresponsive male named Robert Rose [("The decedent")], who was bleeding profusely from a wound in his chest. [The decedent] was lying in the bike lane on the south side of Market Street. [The decedent] subsequently died from his wounds. Philadelphia Police Officer Kenneth Bolton was called to secure the scene, where he found several shell casings in .45 and 9mm calibers. The casings were on the surface of Market Street. A total of eight .45 ACP fired cartridge casings were found at the scene of the shooting, along with thirteen 9mm Luger fired cartridge casings.

Khalif Hill lived at 3962 Market Street and knew [the decedent] through his cousin, Tamia Hill. At the time of the shooting, Tamia Hill lived at 3950 Market Street, across the courtyard from Khalif Hill, and was dating [the decedent]. Khalif Hill knew [Appellant] as "Kool-Aid." Immediately after the shooting, he came out of his residence and saw Tamia Hill and his cousin Troy Hill standing over [the decedent]. He stayed outside for a few minutes, but left when the police and emergency vehicles began to arrive.

Approximately one week later, Khalif Hill was questioned by members of the Homicide Division of the Philadelphia Police Department. He did not give a statement, but on September 30, 2010, almost four years later, he was arrested in connection with narcotics, and was again taken to the Homicide Division, at which time he told the police that he had seen the shooting, and that he had seen the two men who shot [the decedent] fleeing the scene. At that time, he told police that two men he knew as Mike and Kool-Aid shot [the decedent], and that Mike held a black gun and Kool-Aid held a machine-gun style weapon with two hands. He identified Michael Gibbons and [Appellant] as the two shooters. He also said that Troy Hill told him that Mike and Kool-Aid had killed [the decedent]. He said that Troy also told him that [the decedent] had bought a car from Kool-Aid but the transmission failed, and that because Kool-Aid was unwilling to give [the decedent] his money back, he shot him instead. At trial, Khalif said that he had not actually witnessed the shooting or heard the shots and he did not see Mike and Kool-Aid leave the scene, but that otherwise his statement was truthful. He also said that he did not want to testify, and that he was nervous to do so because it could be dangerous.

Khalif Hill was held as a material witness in this case, due to the fact that he had tried to avoid giving testimony at the preliminary hearing and had actively evaded Commonwealth attempts to secure his testimony during the weeks prior to trial. He testified that [Appellant's] uncle and another man broke into his house with a gun in the months before trial, robbed him, and asked him why he took the stand. He also testified that Michael Gibbons had encountered him a week before trial in the basement of the Criminal Justice Center and had asked him to change his testimony.

Tamia Hill was dating [the decedent] at the time of his death, and she was with him the day that he saw a Pontiac Bonneville for sale and asked [Appellant] about the car. [The decedent] decided to buy it, so they retrieved $3,500.00 in order to purchase it. Later, when she went with [the decedent] to transfer the title, she saw [Appellant's] name on the old title. They transferred the title into her name.

On the morning of December 23, 2006, Tamia Hill and [the decedent] had discussed the car and the issues that they were having with its performance. Later that evening, she heard [the decedent] preparing to leave the house, and [the decedent] asked her brother, Troy Hill, to walk out with him because the car was acting up. Shortly thereafter, she heard gunshots and went outside to find [the decedent] lying in the street.

After the shooting, Tamia Hill accompanied detectives to the Homicide Division, where she gave a statement. She gave a second statement on February 25, 2007, in which she first mentioned the trouble with the Bonneville. She had never seen the car again after the shooting and she ... reported it stolen.

Troy Hill, Tamia Hill's brother, had sold drugs for [Appellant] in 2007 or 2008. He worked with a runner named Nate, who was responsible for taking daily proceeds to [Appellant] or Michael Gibbons. He saw [the decedent] outside in the street on the night of the shooting, calling [Appellant's] name and complaining loudly about the Bonneville. He then saw [the decedent] approach local drug dealers who were, at that time, working with Nate; [the decedent] smacked them several times, reached into their pockets, and took money from them.

Troy Hill knew that [the decedent] was high on ecstasy and tried to calm him down, but [the decedent] would not be deterred, and after robbing the drug dealers he came back inside the Hill residence and then left again in search of the Bonneville. Hill went with him, but as soon as they went outside he saw [Appellant] and Gibbons running toward [the decedent]. [Appellant] told Gibbons "hit that nigga," and both of them fired on [the decedent]. [The decedent] tried to run, but collapsed from his wounds[.]

Troy Hill did not talk to authorities about what he had seen, because he did not want to endanger his mother, who lived in the housing development at the scene of the shooting. In May of

- 3 -

2009, while he was in federal custody pending trial in two robberies, he spoke with federal prosecutors and an FBI agent. During his proffer, he said he witnessed this murder. At that time, his family had moved and would presumably no longer be in danger were he to say what he had seen. In August of 2009, Hill entered into a plea agreement. He received a twenty-two year sentence[.]

* * *

Sean Harris lived at the housing development on the 3900 block of Market Street for several months during 2006 and knew [the decedent] well enough to say hello to him. He also recognized [Appellant], [whom] he knew as Kool-Aid. On the night of the shooting, he was driving his intoxicated friend home in his friend's Dodge Caravan, and he parked it across Market Street from the housing development. As he was opening the door to get out of the Caravan, he heard gunshots. He immediately got back in the Caravan. When he looked out the window, he saw [Appellant] shooting at least ten times at [the decedent] with a large black gun, held with both hands.

Harris called 911 immediately. However, because he was scared, he stayed in the Caravan all night. It was cold, and he turned the vehicle on in order to keep warm. At a certain point, it ran out of gasoline, and his friend went to get more. At approximately 7:00 in the morning, he finally emerged from the vehicle.

On December 27, 2006, [ ] Harris was approached by an officer from the University of Pennsylvania's Police Department. The officer asked him if he was okay, and he said that he was not, and that he had not slept since he saw [the decedent's] murder. When the officer entered Harris' information, he told Harris that there was an outstanding warrant for his arrest, and took him into custody. He was taken to the Homicide Division of the Philadelphia Police Department and interviewed by detectives about the murder.

Initially, Harris told the detectives what happened but identified a different person as the shooter because he was afraid of reprisal if he identified [Appellant]. Later, he felt guilty about identifying the wrong person, and in January of 2012, while he was again taken to talk to

- 4 -

detectives about this murder. He explained to them that he did not identify [Appellant] in 2006 because he was afraid for his own safety, but that in all other respects, his prior statement was correct. He confirmed that [Appellant] is the man he saw shoot [the decedent]. The Commonwealth did not offer him anything in consideration for his testimony, though he did testify that he had hoped that the detectives he spoke to would help him with his case.

*Commonwealth v. Oglesby*, 198 A.3d 439, 749 EDA 2017 (Pa. Super. filed September 10, 2018) (Non-Precedential Decision).

The procedural history of this case was summarized by the PCRA court in its Pa.R.A.P. 1925(a) opinion, as follows:

On April 12, 2012, [Appellant] was arrested and charged with Murder and related offenses. On June 11, 2013, [Appellant] appeared before this [c]ourt and elected to be tried by a jury. On June 18, 2013, the jury convicted [Appellant] of First-Degree Murder and Conspiracy to Commit Murder. On that same date, this [c]ourt imposed the mandatory minimum sentence of life imprisonment without parole for First-Degree Murder and a concurrent sentence of twenty to forty years of imprisonment for Conspiracy to Commit Murder, for a total sentence of life imprisonment without parole.

[Appellant] appealed and on November 25, 2014, the Superior Court affirmed his judgment of sentence. On July 8, 2015, the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal.

On April 13, 2016, [Appellant] filed a timely Post-Conviction Relief Act ("PCRA") petition, his first. On February 10, 2017, after an evidentiary hearing, this [c]ourt dismissed the petition. [Appellant] appealed and on September 10, 2018, the Superior Court affirmed this [c]ourt's denial of relief. On June 10, 2019, the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal.

On June 19, 2019, through PCRA counsel, [Appellant] filed the instant, subsequent PCRA petition. On August 12, 2019, this [c]ourt granted [Appellant's] request for an extension to file an

- 5 -

amended petition. On September 16, 2019, [Appellant] filed an amended petition, raising one new issue. On September 26, 2019, the Commonwealth filed its response.[1]

On October 16, 2019, this [c]ourt presided over an evidentiary hearing. On that same date, [Appellant] requested a continuance for further investigation. On November 14, 2019, after [Appellant] elected not to further amend his petition, this [c]ourt dismissed each of his claims. On December 16, 2019, [Appellant] filed a timely Notice of Appeal. On December 23, 2019, this [c]ourt ordered [Appellant] to file a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b). On January 13, 2020, [Appellant] filed a timely 1925(b) Statement.

> [1] The Pennsylvania Office of the Attorney General represented the Commonwealth for the purposes of the instant PCRA. PCRA counsel Lloyd E. Long, III, Esq. is the former law partner of Philadelphia District Attorney Lawrence S. Krasner. The Office of the Attorney General has handled all matters relating to Mr. Krasner's former criminal defense practice to avoid any conflicts of interest or appearance of impropriety.

PCRA Court Opinion, 1/28/20, at 1-2.

The following facts were established at the PCRA hearing:

In September 2013, after seeing then-Philadelphia Mayor Nutter describe the city's Crime reward fund on a television news program, Harris contacted Detective Hagan to inquire request [sic] compensation from the fund, given his testimony in the instant matter. Approximately six weeks later, Detective Hagan informed Harris that he was eligible for recommendation for compensation from the fund. On December 5, 2013, Detective Hagan submitted a memorandum recommending that Harris be paid from the fund in exchange for his prior testimony. In March 2014, Harris received a reward payment of $20,000. This information was not shared with any other Commonwealth investigator or representative.

On January 15, 2019 and March 20, 2019, Harris attended the funerals of his uncle Irvin Quinn and aunt Brenda Quinn, who

died five weeks apart from each other. At each funeral, Harris encountered [Appellant's] father, Leonard Oglesby. At the first funeral, Leonard Oglesby informed Harris that [Appellant] received a life sentence pursuant to the 2013 trial, whereupon Harris told Leonard Oglesby that he wasn't sure whether [Appellant] was the shooter. Leonard Oglesby requested that Harris speak to his private investigator, but Harris ignored all attempts by Leonard Oglesby and the investigator to arrange a meeting. After unexpectedly encountering Leonard Oglesby again at the second funeral, Harris agreed to meet with investigator Thomas Bailey, and spoke to him on March 28, 2019. On April 16, 2019, Harris provided Bailey a written statement recanting his in-court identification of [Appellant] as the shooter.

In early August 2019, the Assistant Attorney General in the instant matter spoke with Detective Hagan in preparation for the October 16, 2019 evidentiary hearing. During their conversation about Harris' recantation, Detective Hagan informed the prosecutor that he had previously recommended Harris for reward money after completing his testimony. Detective Hagan provided the prosecutor with the relevant paperwork, and on August 8, 2019, the Office of the Attorney General disclosed the reward payment to PCRA counsel.

On August 8, 2019, Agents Sean McGlinn and Timothy Barrar of the Pennsylvania Office of the Attorney General interviewed Harris, who informed them that he was "150 percent" sure that [Appellant] shot the decedent in the instant matter. On August 14, 2019, Harris again met with McGlinn and Barrar, and provided them with a written statement again identifying [Appellant] as the shooter. Within that statement, Harris claimed that he recanted his trial testimony because he feared reprisal against him orchestrated by Leonard Oglesby. Harris did not mention receiving award money to neither McGlinn nor Barrar at the August 8 and August 14, 2019 meetings.

During the August 14, 2019 interview with Agents McGlinn and Barrar, Harris requested that he be placed in the witness relocation, which he entered on August 19, 2019. As a participant in the program, Harris received a total payment of $5,911.54 to cover rent and other living expenses in anticipation of the evidentiary hearing.

PCRA Court Opinion, 1/28/20, at 5-7.

On appeal, Appellant presents the following issues for our review:

I. The PCRA court erred by determining that Sean Harris'[s] recantation did not entitle [Appellant] to relief where his testimony was the only evidence of guilt not tainted by **Brady**[1] violations.

II. The PCRA [c]ourt erred by determining that the circumstances surrounding a $20,000 reward to Sean Harris did not constitute a **Brady** violation.

Appellant's Brief at 12, 19.

When reviewing the propriety of an order denying PCRA relief, we consider the record "in the light most favorable to the prevailing party at the PCRA level." **Commonwealth v. Stultz**, 114 A.3d 865, 872 (Pa. Super. 2015) (quoting **Commonwealth v. Henkel**, 90 A.3d 16, 20 (Pa. Super. 2014) (en banc)). This Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. **Commonwealth v. Robinson**, 139 A.3d 178, 185 (Pa. 2016). The PCRA court's findings will not be disturbed unless there is no support for them in the certified record. **Commonwealth v. Lippert**, 85 A.3d 1095, 1100 (Pa. Super. 2014).

A PCRA petition must be filed within one year of the date that the judgment of sentence becomes final. 42 Pa.C.S. § 9545(b)(1). This time requirement is mandatory and jurisdictional in nature, and the court may not ignore it in order to reach the merits of the petition. **Commonwealth v.**

---

[1] **Brady v. Maryland**, 373 U.S. 83 (1963).

*Hernandez*, 79 A.3d 649, 651 (Pa. Super. 2013). A judgment of sentence "becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S. § 9545(b)(3).

However, an untimely petition may be received when the petition alleges, and the petitioner proves, that any of the three limited exceptions to the time for filing the petition, set forth at 42 Pa.C.S. § 9545(b)(1)(i), (ii), and (iii), is met.[2] A petition invoking one of these exceptions must be filed within one year of the date the claim could first have been presented.[3] 42 Pa.C.S. § 9545(b)(2).

---

[2] The exceptions to the timeliness requirement are:

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i), (ii), and (iii).

[3] Until recently, a petition invoking an exception was required to be filed within sixty days of the date the claim could have been presented. However,

Our review of the record reflects that Appellant initially was sentenced on June 18, 2013. Appellant's judgment of sentence was affirmed on November 25, 2014, and on July 8, 2015, the Supreme Court of Pennsylvania denied Appellant's petition for allowance of appeal. ***Commonwealth v. Oglesby***, 113 A.3d 358, 3048 EDA 2013 (Pa. Super. filed November 25, 2014) (unpublished memorandum), *appeal denied*, 117 A.3d 1281, 85 EAL 2015 (Pa. filed July 8, 2015).

As such, Appellant's judgment of sentence became final for PCRA purposes on October 6, 2015, ninety days after the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal and time expired for Appellant to file an appeal with the United States Supreme Court. 42 Pa.C.S. § 9545(b)(3); U.S. Sup. Ct. R. 13. Therefore, Appellant had to file the current PCRA petition by October 6, 2016, in order for it to be timely. ***See*** 42 Pa.C.S. § 9545(b)(1) (a PCRA petition must be filed within one year of the date that the judgment of sentence becomes final). Appellant did not file the instant PCRA petition until June 19, 2019. Thus, Appellant's instant PCRA petition is patently untimely.

---

Act 146 of 2018 amended 42 Pa.C.S. § 9545(b)(2), and Section 9545(b)(2) now provides that a PCRA petition invoking a timeliness exception must be filed within one year of the date the claim could have been presented. ***See*** 2018 Pa.Legis.Serv.Act 2018-146 (S.B. 915), effective December 24, 2018, § 2 and § 3 ("[T]he amendment … shall apply to claims arising on Dec. 24, 2017 or thereafter."). Although applicable to Appellant's instant petition because such petition was filed after December 24, 2018, the change in the law from sixty days to one year does not alter our analysis.

- 10 -

As previously stated, if a petitioner does not file a timely PCRA petition, his petition may nevertheless be received under any of the three limited exceptions to the timeliness requirements of the PCRA. 42 Pa.C.S. § 9545(b)(1). If a petitioner asserts one of these exceptions, he must file his petition within one year of the date that the exception could be asserted. 42 Pa.C.S. § 9545(b)(2). It is the petitioner's burden to allege and prove that one of the exceptions exists. *Commonwealth v. Whitehawk*, 146 A.3d 266, 269–270 (Pa. Super. 2016).

In both issues, Appellant asserts that he has met the criteria for the newly discovered-facts exception to the PCRA time-bar and the elements required for an underlying after-discovered evidence claim. Specifically, in his first issue, Appellant maintains that Sean Harris's April 16, 2019 recantation of testimony constituted newly discovered evidence and entitled him to relief on that basis. Appellant's Brief at 12-19. In his second issue, Appellant asserts that the newly discovered-facts exception applies because non-disclosure of the payment of a $20,000.00 reward to Sean Harris was a *Brady* violation, and such evidence entitled him to relief on that basis. Appellant's Brief at 19-23.

"[A] facially untimely PCRA petitioner attempting to raise a substantive after-discovered-evidence claim must first establish jurisdiction by pleading and proving an exception to the PCRA time-bar." *Commonwealth v. Brown*, 1111 A.3d 171, 179 (Pa. Super. 2015). This Court further explained:

The timeliness exception set forth at Section 9545(b)(1)(ii) has often mistakenly been referred to as the "after-discovered evidence" exception. This shorthand reference was a misnomer, since the plain language of subsection (b)(1)(ii) does not require the petitioner to allege and prove a claim of 'after-discovered evidence. Rather, as an initial jurisdictional threshold, Section 9545(b)(1)(ii) requires a petitioner to allege and prove that there were facts unknown to him and that he exercised due diligence in discovering those facts. *See* 42 Pa.C.S.A. § 9545(b)(1)(ii). Once jurisdiction is established, a PCRA petitioner can present a substantive after-discovered-evidence claim. *See* 42 Pa.C.S.A. § 9543(a)(2)(vi) (explaining that to be eligible for relief under PCRA, petitioner must plead and prove by preponderance of evidence that conviction or sentence resulted from, inter alia, unavailability at time of trial of exculpatory evidence that has subsequently become available and would have changed outcome of trial if it had been introduced). In other words, the "new facts" exception at:

> Subsection (b)(1)(ii) has two components, which must be alleged and proved. Namely, the petitioner must establish that: 1) the facts upon which the claim was predicated were unknown and 2) could not have been ascertained by the exercise of due diligence. If the petitioner alleges and proves these two components, then the PCRA court has jurisdiction over the claim under this subsection.

Thus, the "new facts" exception at Section 9545(b)(1)(ii) does not require any merits analysis of an underlying after-discovered-evidence claim.[4]

> [4] To obtain relief on a substantive after-discovered-evidence claim under the PCRA, a petitioner must demonstrate: (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict. The substantive merits-based analysis is more stringent than the analysis required by the "new facts" exception to establish jurisdiction.

**Brown**, 111 A.3d at 176-177 (some internal citations and quotation marks omitted).

The PCRA court provided a thorough and detailed discussion, concluding that although Appellant met the newly discovered-facts exception to the PCRA time-bar, Appellant failed to establish that he was entitled to relief on his claims of after-discovered evidence. The PCRA court provided the following analysis:

> [Appellant] argues that jurisdiction is conferred to each of his claims based on the newly-discovered fact exception. On his first claim, [Appellant] contends that he discovered Sean Harris' recantation on January 15, 2019 at the earliest, when his father Leonard Oglesby encountered Harris at the funerals for Irwin and Brenda Quinn. [Appellant] submitted his subsequent petition on June 19, 2019, nine days after the Supreme Court of Pennsylvania affirmed the dismissal of his previous PCRA petition.

> This [c]ourt determines that [Appellant] has presented a sufficient factual basis to warrant application of the newly-discovered fact exception on this claim. [Appellant] had not been in contact with Sean Harris between the time of his trial and the March 20, 2019 encounter, and Harris' recantation was not the type of evidence that would have been discovered through the exercise of due diligence. [Appellant] filed the instant petition nine days after the Supreme Court of Pennsylvania concluded its review. [Appellant] could not file a petition while review of his prior petition was still pending. Accordingly, this [c]ourt has jurisdiction to address the instant claim.

> [Appellant's] remaining *Brady* claim similarly warrants review based on the newly-discovered fact exception. While it is clear that on December 5, 2013, Detective Hagan recommended Sean Harris for compensation in exchange for his testimony at trial, [Appellant's] receipt of the reward money was not a matter of the public record that could be discovered through the exercise of due diligence. In fact, neither [Appellant] nor counsel for the Commonwealth was made aware of this award until August 2019, when Detective Hagan informed the prosecutor of the reward.

This is sufficient to meet the threshold requirement for jurisdiction pursuant to the newly-discovered fact exception.

While [Appellant] has established grounds for this [c]ourt to conduct merit-analysis in this matter, neither of [Appellant's] averments are sufficient to warrant collateral relief. With respect to [Appellant's] after-discovered recantation claim, in order to obtain relief based on after-discovered evidence, a petitioner must show that the evidence: (1) could not have been obtained prior to the conclusion of trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) would not be used solely to impeach the credibility of a witness; and, (4) would likely result in a different verdict if a new trial were granted. *Commonwealth v. Williams*, 215 A.3d 1019, 1024 (Pa. Super. 2019) (*citing Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008)).

The Supreme Court of Pennsylvania has characterized recantation testimony as "extremely unreliable," especially where the assertion involves an admission of perjury. *Commonwealth v. Small*, 189 A.3d 961, 978 (Pa. 2019) (citing *Commonwealth Mosteller*, 284 A.2d 786, 788 (Pa. 1971)). Accordingly, PCRA courts are directed to assess the credibility and significance of the recantation in light of the evidence as a whole. *Id.* (*citing Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004)).

Harris' recantation of his trial testimony was too unreliable to warrant relief in this matter. At the October 16, 2019 evidentiary hearing, Harris recalled how he encountered Leonard Oglesby, [Appellant's] father, at his uncle's funeral. There, Harris informed Oglesby that he was willing to recant his testimony, but only did so to avoid a confrontation or any trouble between himself, Oglesby, and Oglesby's associates. Harris initially avoided any further entanglement with Leonard Oglesby, but agreed to meet with his private detective after a second, unexpected meeting during the funeral for his aunt. Harris eventually signed a statement on April 16, 2019.

Harris further recalled speaking [with] investigators representing the Commonwealth on August 14, 2019, wherein he stated to those investigators that his April 16, 2019 recantation was false, that [Appellant] shot and killed the decedent in this case, and that he feared reprisal from Leonard Oglesby.[2] *Id.* at 101-102. When confronted by PCRA counsel at the evidentiary

hearing, Harris thoroughly and unequivocally denied the veracity of his April 16, 2019 recantation, and stated that he correctly identified [Appellant] as the shooter after having seen his face on the night of the murder.

> [2] On August 19, 2019, Harris entered the witness protection program.

Because Harris forcefully, clearly, and unequivocally rejected his own April 16, 2019 recantation and characterized it as false, the recantation is unsupported by any credible testimony sufficient to warrant collateral relief. For that reason alone, [Appellant's] claim fails. Based on the evidence presented at the evidentiary hearing, it appears that Harris provided [Appellant] with his recantation statement only after sustained pressure by [Appellant's] family, causing Harris to fear for his life. In the weeks after Irvin Quinn's funeral, Harris avoided and ignored Leonard Oglesby's multiple attempts have Harris provide a written statement recanting [the] trial testimony. Despite his efforts to evade Leonard Oglesby and his investigator, Harris unexpectedly encountered him at Brenda Quinn's funeral, whereupon he agreed to meet with the private detective. When given the opportunity to speak to investigators from the Office of the Attorney General, however, Harris immediately retracted his recantation and requested placement in a witness protection program. Accordingly, this [c]ourt cannot find Harris' recantation sufficiently credible to support the instant claim for relief.

[Appellant] next claims that the Commonwealth withheld evidence that Sean Harris received an award payment in exchange for his testimony, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To succeed on a *Brady* claim, a petitioner must show that: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and, (3) prejudice ensued. *Commonwealth v. Sandusky*, 203 A.3d 1033, 1061 (Pa. 2019) (citing *Commonwealth v. Roney*, 79 A.3d 595, 607 (Pa. 2013). The petitioner carries the burden of proving that the suppressed or withheld evidence was material, such that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Id.* at 1061-1062.

- 15 -

[Appellant] fails to establish the merits of any prong of his *Brady* claim. While it is undisputed that Harris received an award payment from the City of Philadelphia after he testified against [Appellant] in 2013, his testimony at the evidentiary hearing established that he was unaware that the Crime Reward Fund existed until September 2013, three months after he testified, and that he did not receive payment from the fund until March 2014, approximately nine months after he testified. [Appellant] provided a statement incriminating [Appellant] to Detective Hagan on January 25, 2012, one day prior to then-Mayor Nutter announcing the establishment of the City's Crime Reward Fund. Detective Hagan was not aware of the fund's existence until Harris contacted him in September 2013, three months after the trial concluded. [Appellant] cannot establish that Harris' trial testimony was influenced by the promise of an award from the Crime Reward Fund.[3]

> [3] Mayor Nutter established the Crime Reward Fund in January 2012.

[Appellant] further fails to demonstrate that the Commonwealth willfully or inadvertently suppressed evidence that Harris received such an award. Detective Hagan recommended Harris for payment several months after the jury reached his verdict, and there is no indication on the record that Hagan informed the prosecution until August of 2019. Upon receiving information that Harris had received an award from the Crime Reward Fund, the Commonwealth immediately forwarded that information to PCRA counsel on August 8, 2019, permitting him to amend the June 19, 2019 petition to include the instant *Brady* claim. The prosecution cannot be deemed to have violated *Brady* based on this sequence of events. Accordingly, [Appellant] fails to carry his burden on each of his raised claims, and this [c]ourt acted properly in denying his request for relief.

PCRA Court Opinion, 1/28/20, at 9-13.

We agree with the PCRA court's thorough and well-reasoned analysis.

Although Appellant met the preliminary criteria for consideration under the

newly discovered-facts exception to the PCRA time-bar for his two claims, the

underlying claims of after-discovered evidence lack merit, as explained by the

PCRA court.  Thus, Appellant is entitled to no relief on his PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/30/20